Commissioners. So, like I said, those are in chronological order, not necessarily order of importance. So, do the judges have any particular points you want to raise? Start with your choice. Okay. So, while starting with the dismissal of the punitive damages claim, this court has made two decisions that reversed on the issue of punitive We have to have a showing by the plaintiff of evil motive or intent or recklessness or callous indifference. Right. Or reckless indifference. And it appears that you're relying on reckless indifference. Right. Reckless indifference to federally protected rights. So, we have a defendant who was a judge who must be said to be well aware of this. Was that argument raised before the district court? Yes. That you were relying on the fact that in his position he would know? Yes. And that was in... Of course, don't we presume that all citizens know the law? Probably, but certainly we can presume that a judge knows the law. And as far as the judge is concerned, knowing the general law, the Supreme Court says isn't enough. The Supreme Court says you really got to know particulars. Well, I think it's clear that the judge knew that, like everyone, but certainly a judge would know that Ms. Eisenhower had a right to be free from gender discrimination in the workplace. So, the fact that he then wrote a poem that the jury found he intended for her to find, that he touched her inappropriately, that he told her he had a dream about her naked, all these things would have to be intentional violations of her right to be free from gender discrimination in the workplace. I don't know how more clearly you could prove that someone knew of that right other than being a judge trained in law. And when did you raise the fact of his being a judge is enough? That was in the pre-trial, not pre-trial, it was during trial, during the conference about jury instructions right before the end of the trial. And that's cited in the brief, the specific part of the transcript where I made that remark. And did you seek an instruction to that effect? This wasn't a matter, yes, I mean, originally not in the instruction about him being a judge, but this was in the context of arguing whether we got to seek punitive damages at all. And the judge said, I'm not, I don't see any evidence of intentional or reckless disregard. So, you didn't seek an instruction per se? Well, if he's a judge, we can assume recklessness. I don't remember, Your Honor, what the actual instruction that we had sought stated. I think it provided the standard. We don't have an issue here that the court erred in not giving proper instructions. Well, the judge didn't give any instruction on punitive damages because he took it from the jury before we got to the instruction phase. So, because that would have been one of the final instructions. And this conference took place, I believe, on the night before the closing statements. So that I understand this first point, you are not arguing generally that on the law punitive should be accessible against everybody in this situation. You are arguing a different question, which is specifically we should have a separate standard for judges. I'm not arguing that there should be a separate standard for judges. But in this case, given the context that he was a judge, that this was his subordinate in the workplace, that there can be, that this should have been decided by a jury. They had enough evidence to show that he was aware of her federally protected rights. So, your argument here really is punitive should not have been dismissed under all the circumstances, one of which is that this guy is a judge. Right. Okay. Right. Right. And then, discussing the economic damages against Judge Story, the defense really didn't put up any legitimate argument that he shouldn't have been liable for those economic damages. The jury was specifically given a question in the verdict form that said, due to Defendant Craig Story's discrimination based on gender, did plaintiffs sustain economic damages for lost earnings from the date of injury to the date of verdict, and if so, how much? And so, with that precise question, they then awarded $58,427. But the question is who's to pay, right? No. She lost income, definitely, because she lost her job. Right. But isn't the question, as far as getting the judge into a question of liability, whether or not his actions caused her loss? Your Honor, that question was specific to the judge. So, the $58,000 was awarded against the judge. Right. And so, the verdict form, I think, is in the record at 162 to 172. I think the argument against the economic damages was the sort of thing that judges have to be the ones to decide, that this was too distant, too contingent, because the jury would have to find that because of his harassment of her, that led to controversy about the court, and the court was eliminated, and that's why she lost her job. Right. And that's a little too distant from his actions to make him liable for that. Was that? Yes. And that's what the defense argued, that they provided no support for that. Well, but you're the ones that wanted the damages, so you have the burden to prove there was causation, and that it was predictable, it was foreseeable. Right. And you look at all the things. I mean, it's hard to imagine that he foresaw that his courthouse would get switched off because of this event. I mean, it really is a big disconnect. Well, Your Honor, we put that question to the jury, and they answered that specific question that I read, and generally, proximate cause is a question for the jury. Well, remoteness is not. Foreseeability, to some extent, may be a fact question, but at some point, the courts step in and say, that's just too remote, and this strikes me as pretty remote. I mean, there's a factual causation here. You have a theory of factual causation. Because of his misconduct toward her, ultimately, the court was disbanded and she lost her job. Right. The question is whether that's the sort of thing that you can anticipate from committing sexual harassment. Right. That the whole enterprise will end. Right. And we, you know, cited two testimonies that the judge gave that if this is found out, you know, we're all in trouble. So I think he did foresee the implosion that happened. But don't we look at why the court was ultimately closed and who made that decision and why? That's part of it, but I don't think he can be absolved of any responsibility, knowing that that was a good possibility that then the commissioners would act to close the court to, you know, end all this embarrassment that he had brought on. So everyone who loses her job at the Weinstein companies can sue Weinstein, saying that was foreseeable result, that was not too remote a result of his misconduct. I think that's a good analogy, and I would say yes. You wouldn't say everyone at Weinstein could sue him. The ones that could sue him would be those who he sexually harassed. The ones who he sexually harassed and then who if, you know, they got rid of the company, if these people lost their jobs, in order to deal with the fallout of that, because he wouldn't take responsibility. But don't you have a lot of evidence in this record that the county commissioners were looking at closure of this court because it was losing revenue? And they were also concerned that if this judge, if his term re-upped, if he re-upped for what, another six years? Was that his term? Right. They would be on the hook for pension and salary to him. So they were looking at it from a budgetary point of view. Is this court making money? And if we keep it going, how much will it cost us? That's the argument the defendants made, Your Honor. The jury found against them in the first trial because there was evidence to the contrary, that they came up with these excuses after the court was closed. They weren't losing money. That's the chief argument to the contrary. They weren't losing money. They all said that they were, which was not true. Well, the real projection was not how much they were losing at the moment or not, but rather the projection out was that it was going to become a money-losing proposition. That is something. And then they changed their answers after the fact. But originally they had said in depositions, oh, the court was hemorrhaging money at the time. And then only when confronted with the actual budget documents that showed that wasn't true did they say, oh, well, what we meant was we were projecting out. And, you know, the jury in the first case just didn't believe that. And there was lots of reasons not to believe that, including, you know, the changing stories, the fact that they had said that the budgets would reflect the court closing when it didn't. And then there was all these things that they had said, but then they were confronted with the documents that showed that they weren't telling the truth, and then they had to change their story. And, Your Honor, I'm going to reserve the rest of my time. Thank you. Thank you. I represent Judge Story, and we're going to divide with my co-counsel the seven and a half minutes. Right. I understand. Thank you. I just want to respond quickly to the damages argument with respect to Judge Story. In order for this to be foreseeable, that there would be damages, he would have to proceed that the county would investigate and dismiss, that the JCC would investigate and dismiss. That's not so surprising. If you're committing sexual misconduct, it's not too surprising you would expect that those people with general authority might investigate. So proceed, but so far that doesn't strike me as pretty good. Then he'd have to foresee that Ms. Eisenhower actually went to the press and published a phone. Again, that may not be too unforeseeable. I mean, if you've engaged in sexual misconduct to somebody, I would think that there's a pretty good prediction that they would go to the press or complain about it. But proceed. Well, and then he would have to. It's getting more and more remote, but at least on those first three points, I'm not sure that at least I buy it, but you're getting warmer. Then he would have to also foresee that the county would come in and close the court altogether. Now, was there any talk before this alleged sexual harassment about closing the courthouse? I'm sorry? Was there any talk, any minutes, any studies before this sexual misconduct that was alleged occurred about closing the courthouse? Well, according to the county, yes. But that actually will be addressed by my co-counsel. And with respect to punitive damages. What's the standard in Kolstad? Well, the argument is that simply because he's a justice court judge, he should have known. Well, the argument is that ordinarily intentional, tortuous conduct is subject to punitive damages. But Kolstad said, no, that's not enough. You have to intend to violate the federal law. That's right. And my gosh, surely he knew that harassing, sexually harassing an employee violated the federal law. Well, it has to be more than intentional harassment for punitive damages. It has to be. What it has to do is. Well, go ahead. Tell me what you think. It has to be malice or reckless indifference. But the Supreme Court made clear it's just you know that you're violating, that you're intentionally violating the federal law. It doesn't require the – what was the issue that they rejected in Kolstad? It's evil intent or malice or reckless indifference. They defined that. They specifically said it doesn't have to be egregious, for example. But if you know what the law requires and you intentionally violate it, in this context, then you are subject to punitive damages is the way I read Kolstad. If he knew that, then why did we have the Sterritt case? The Sterritt case was the case that made the decision that you could have equal protection violation with respect to sexual harassment. Why did the court, if all judges know this, have to decide that case in 1989? There was no evidence presented that this justice court judge had the training or education over and above that that was disclosed in the Sterritt case. If every judge knows that that. Don't they? Don't you think a jury could have found that? I don't believe that it could because at that point it became a question of law for the judge. I mean, this court has held on numerous occasions that if there is no evidence that there was malice or reckless indifference, that it should be taken away from the jury. Be careful about those terms because malice might sound like all he did was have an attraction to her so he wasn't malicious. But we're talking about something rather different. We're talking about an intentional violation of the law. And what makes this different is you can have an intentional violation. You can commit acts that violate the law without intending to violate the law because you didn't realize this was a violation of the Title VII or whatever. And it just strikes me as contrary to common sense to think that almost anyone wouldn't know. These days anyone would know. I think you'd have to agree. These days anyone would know you don't sexually harass an employee. Well, today we're talking. Yes. Okay. I can't imagine a judge at the time this happened not knowing that. This Court held in Searles v. Van Bieber that the plaintiff, in order to have punitives go to the jury, they must demonstrate evil motive or intent to do harm. And that was never demonstrated. That's not the standard under Kolstad. I'm sorry? I don't think Kolstad says that. I don't think the Supreme Court says that. Okay. Maybe I'm misreading it. But that's what you're saying. Yes. That's what I'm saying. It specifically says in Kolstad v. ADA that 42 U.S.C. 1983 or 1981 requires a showing by the plaintiff that the conduct was intended to discriminate. Now, that brings me to one of the cross-appeal issues, which is the poem, and whether or not it was properly given to the jury prior to any additional evidence being presented. Let me ask you about law of the case on that. In the prior appeal, this Court relied on that poem in support of overturning the summary judgment. Now, implicit in that is that the prior panel found that it was relevant. I would think that would be law of the case. And we're not totally bound by prior panel, but, boy, we are pretty deferential. Well, I don't believe that it is law of the case. Well, isn't it relevant evidence? I'm sorry? Isn't it relevant evidence? I'm not saying that it's not relevant. But there is no evidence that any 403 balancing was ever done with respect to the admission of the poem to the jury. I know the judge did consider that, and he considered it in the sense of it would be more relevant if it were discovered later and less relevant if it were earlier, so he was using a relevancy analysis and then saying during that analysis that it could be prejudicial, but if it's later, the relevancy is going to be more important, and so it comes in. So I think he did. He may not have said the words 403, but I think he did do a balancing test. Well, I don't believe – I believe that this poem was more prejudicial. The plaintiff even – Well, so you just – but we view that under an abuse of discretion standard. That is true. Can I ask a question that I'm very eager that it not be misunderstood? When a person like this judge is deciding what is appropriate conduct and banter with his coworkers, can the judge take into account the coworker's previous banter back or behavior in a calculus of how much banter would be acceptable or offensive to that coworker? Yes. In context, what I understand from this record is that Ms. Eisenhower was not inappropriate, but that she was at least evidencing some – that's the wrong word – some openness to banter that other people might not have accepted. That is correct. Like twirling things off of herself and some posters and things. So is that a legitimate – it would never be a legitimate concern, obviously, for physical matters that are offensive, but would that be in a calculus of what a judge or anybody might think would be non-offensive to that particular person? That was certainly our argument at the time of trial, and I'm going to turn the rest of my time over to Hope. Good morning. I'm Susan Blackdon, and I'm here on behalf of Weber County and the Weber County Commissioners. And to cut to the chase with some of the questions that the Court was asking of previous counsel, it absolutely was a budget decision to close the Weber County Justice Court. What happened in 2006 was that Ogden City, which formally took many of their cases to the Weber County Justice Court, opened their own justice court. And so a lot of the money was being diverted into that particular court. When was that court opened? In 2006, so before the claim of sexual harassment. And from that point forward, the county commissioners, as well as even Marcia Eisenhower and Judge Story, were looking and seeing that the revenues were dropping, and they were dropping precipitously. The judge set aside the verdict against the individual county commissioners. Yes, sir. How is that consistent with our ruling on the first appeal, that there was sufficient evidence to support the claims against the individual commissioners? I believe that if you look at the Tenth Circuit Court decision in that respect, it was not a full airing of all of the evidence that was going to be presented at the time of trial. And there was ample evidence presented at the time of trial that none of the county commissioners knew anything about what was going on with Marcia Eisenhower. So you see it as our initial ruling on a summary judgment. That was then, and that was before evidence came in to bolster everybody's position at trial. And so our view of the case is different now. Yes, I believe that's correct. And to elaborate on that. Let me ask you about it. I'm sorry. Just could you give me a couple of new pieces of evidence that were not before the Tenth Circuit on the first appeal that developed later? Yes. Just give me two, and then Judge Hartch has a question, so I don't want to elaborate. Well, and I think it's really important for this Court to consider a couple of key factors. First of all, the newspaper article that is really the crux of this particular case that went on to trial was not even discussed in any of the depositions whatsoever. There was no evidence. It was not before the Tenth Circuit on its first ruling? It was as far as the First Amendment claim was concerned and as far as the whistleblower claim was concerned. But there wasn't any evidence about the county commissioner's response to the newspaper article at that point in time. The county commissioners all testified that they just barely scanned the article. I think if you take a close look at the article, there's really nothing critical about the county as a whole. As a matter of fact, it more or less talks about what the county was doing to try to take care of Mrs. Eisenhower. No mention of the county commissioners at all. There was nothing in the record as of the point in time when this Court first considered that issue. And that was more fully developed at the time of the trial. But on the prior appeal, the panel said that the evidence that was submitted in support of and against summary judgment was sufficient for a jury to find the requisite intent by the individual county commissioners. And was there any of that evidence that didn't appear at the trial? And again, I think... Just answer that question first, please. Okay. Would you restate it? I just want to make sure I've got it. Was there any evidence on which the prior panel relied to overturn the summary judgment? Was any of that evidence not offered at trial? Was that evidence presented to the jury? And I go back again to what was on the record as of the time of the first appeal. There was very scant evidence about what the county was doing. It's really important to me that you answer Judge Hart's question. I think there was significant evidence that wasn't presented to the first... No, that's not my question. Okay. That's not my question. You can make an argument. But first answer my question. Was any of the evidence on which we relied as supporting a finding by a jury, was any of that evidence not in fact presented to the jury? I think that's true. Okay. I think that's absolutely true. So you're saying that because of additional evidence, no one would have believed that. I guess you're saying that because ordinarily if there's enough evidence for a jury to find something, we don't care about other evidence that might contradict it. And you seem to be arguing that we should care. And that's a new one for me. Okay. Well, let me just put it this way to you, Your Honor. I think if you look at the issues that were presented to the jury in the second trial, they were presented with whether or not the county as a whole had discriminated and retaliated against Ms. Eisenhower in violation of her First Amendment rights and the Whistleblower Act. They found that there was no substance to those claims. In order to find the commissioners personally and individually liable is, in essence, a higher standard because they're entitled to qualified immunity as office holders. Ms. Eisenhower never pointed to any specific thing that any one of those commissioners did where they took personal action, personal involvement. They voted. They voted. They voted, which was part of their duties and responsibilities. And they voted based on the budget issues. Yeah. But they voted. So they did take individual action. Yes. I didn't see a claim of legislative immunity here. No. They had qualified immunity as a fact because they were. But my point being this, Your Honor, is that there's a higher threshold in a situation where you're looking at deliberate, intentional, personal actions on the part of the county commissioners. In the lower standard against Weber County, the jury returned a verdict in favor of Weber County. It just defies logic to think that they would come back in with this set of facts and decide that the county commissioners were personally liable when they didn't find Weber County liable. And I think that that's really important in that instance because there wasn't personal. There was nothing that they did other than their duty, which was to look at the budget, decide the court needed to be closed for budget reasons that the record is amply full of, and it had nothing to do with Miss Eisenhower. You're out of time. Are there other questions? Thank you, Your Honor. Thank you. Your Honors, to answer a couple things that came up first, in the record at A780 is when I discussed the punitive damages standard and the fact that Judge Story. 8780? The record at 780, page 780, that the judge was, because he was a judge, he knew about Miss Eisenhower's federally protected rights. But I wanted to start with something that Judge Hartch just said. I want to clarify, the judge didn't set aside the verdict against the individual commissioners. He refused to allow the individual commissioners to be decided by the jury. And so that is discussed in the record at page 2265 and thereabouts. So I want to be clear, that was taken from the jury before they got a chance to decide it on the evening before closing argument. I'm inclined to think that it was law of the case that it should have gone to the jury. But if the jury ruled in favor of the county on the same claims, doesn't that indicate that this was harmless error? Well, and that goes into, you know, all the exclusions that we believe were in error. So if, yes, if the verdict stood, you know, should, if this court decides that the verdict should stand, then I'm not sure we, well, I think we should be allowed to go against the county commissioners. Well, I mean, maybe we need supplemental briefing on this, because I don't think that was argued in the briefs that it was harmless error. But that was an interesting point. Right. I mean, I think the record is so replete with exclusions that harmed. Oh, you're talking about the evidentiary challenge. Right, right. The problem was you never said this particular ruling was wrong. You just said there were so many more rulings against me than against them. And that could be perfectly proper. Maybe your objections weren't any good and theirs were good. You have to show that there was an actual error in something. Yeah, counting something and going, you know, so many on our side and so many on their side and saying therefore the court abused its discretion is not the proper approach. Well, Your Honors, and my time is out. I'm going to finish my thought on this. So I talked about how the exclusion of the Utah Open and Public Meetings Act was an error. But there were so many other things. I mean, the judge wouldn't let my client talk about the county's policies. I identified that objection. That's in the record at 1560. You identified it by page side to the record or did you identify by a description of what the error was? Both. Both. In the in the in that sort of list at the end, I identified the various objections that were made and sustained. But I picked several of them that I thought were important and obviously incorrect to focus on. I mean, because there are so many, I couldn't go into every one. But just for instance, and this is one in the record at page 1560, I asked my client what was the county's policy regarding rehiring former employees because part of this was their failure to rehire. And this is a direct quote. So the defense counsel said, objection, Your Honor. The judge said sustained without giving me a chance to respond. And then we took a lunch break. So that is just one of so many examples of where evidence was excluded regarding the policies, regarding my client, why she brought the lawsuit in the first place, why the 25. You're out of time. Okay, thank you. Thank you. Thank you. Case is submitted.